RENDERED: FEBRUARY 14, 2019
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2017-SC-000208-DG

DATE 3/7/19 Kim Redmon, DC

RICHARD C. OLIPHANT, M.D. AND
LOUISVILLE PHYSICIANS FOR WOMEN,
PLLC

APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.          CASE NO. 2011-CA-000100-MR
JEFFERSON CIRCUIT COURT NO. 05-CI-002925

BILLIE JO RIES; BILLIE JO RIES, AS          APPELLEES
NEXT FRIEND OF INFANT CHILD, LAUREN
ELIZABETH RIES; KEVIN RIES; AND KEVIN
RIES, AS NEXT FRIEND OF INFANT CHILD,
LAUREN ELIZABETH RIES

**OPINION OF THE COURT BY JUSTICE HUGHES**

**REVERSING AND REINSTATING**

Lauren Ries was born in 1997 with multiple disabilities as a result of

medical complications before and during birth. In 2010, after years of medical

negligence litigation between the Ries family and Lauren's doctors and the

hospital, a Jefferson Circuit Court jury rendered a verdict in favor of the

defendants and the trial court entered a judgment to that effect. The Court of

Appeals initially reversed and ordered a new trial due to a *Daubert* issue that it

concluded the trial court had decided erroneously, but this Court unanimously

reversed and remanded to the appellate court for consideration of a second

issue raised by the Rieses that had not been addressed. *Oliphant v. Ries*, 460 S.W.3d 889 (Ky. 2015). On remand a divided appellate panel reversed again, holding that the trial court erred by limiting an expert's testimony. The case is now before this Court a second time on discretionary review. Finding no error in the trial court's challenged ruling, we reverse and reinstate the judgment.

## FACTS AND PROCEDURAL HISTORY

On January 20, 1997, Billie Jo Ries was 36-weeks pregnant with a baby girl, Lauren. At approximately 5:00 a.m., Ries discovered that she was experiencing bright red vaginal bleeding. Ries and her husband contacted the on-call obstetrician for her doctor's office, Dr. Richard Oliphant of Louisville Physicians for Women, who instructed them to go to the hospital. Dr. Oliphant believed that Ries had suffered a partial placental abruption, which required urgent, but not emergent, attention.

The Rieses went to Baptist East Hospital (the Hospital) and the nurse called Dr. Oliphant, who was completing a delivery at another hospital. The nurse informed Dr. Oliphant that Ries and the baby were relatively stable. Soon after, the baby's heart rate decelerated, and the nurse called to request Dr. Oliphant's immediate presence. Dr. Oliphant arrived at the Hospital and performed an emergency C-section, delivering Lauren at 6:59 a.m.

In addition to the possible placental abruption, Ries apparently also suffered from a somewhat rare and dangerous condition known as vasa previa with velamentous insertion, which was unknown to the medical staff that

2

delivered Lauren.[1]  One of these conditions caused Lauren to bleed in utero and lose approximately one-third to one-half of her blood volume.  While the parties strongly disagree as to whether Lauren's bleeding occurred before or after the Rieses arrived at the Hospital, Lauren was injured as a result and is now severely disabled.

In 2005, the Rieses, on behalf of themselves and Lauren, sued the Hospital, Louisville Physicians for Women, Dr. Oliphant, Dr. Tonya Robinson (the neonatologist who treated Lauren at birth), and Dr. Robinson's practice (collectively "the Defendants") in Jefferson Circuit Court.  At trial, the Rieses argued that the majority of Lauren's blood loss occurred after she arrived at the Hospital and her injuries resulted from the delay in delivering the baby, and the inadequate care Lauren received after delivery.  The Defendants argued that the majority of Lauren's blood loss occurred before she arrived at the Hospital and therefore her injuries were not preventable.  We review the pretrial proceedings relevant to the issue before us generally, with reference to additional details as necessary in our analysis.

---

[1] Vasa previa occurs when the fetal blood vessels cross over the cervix, underneath the baby, creating a risk that the blood vessels will rupture or compress, causing the baby to bleed out or suffer a lack of oxygen. Catherine Ebbing, et al. *Prevalence, Risk Factors and Outcomes of Velamentous and Marginal Cord Insertions,* PLoS One: A Peer Reviewed, Open Access Journal (July 30, 2013) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3728211/. Velamentous insertion occurs when the umbilical vessels insert into the membranes before they reach the placenta. This results in a lack of protection of the umbilical vessels, increasing the risk that the vessels will rupture. *Id.*

From 2005 to 2010, the parties engaged in extensive discovery. In late 2009, the parties filed their initial expert witness disclosures. The Rieses' experts included Dr. Carolyn Crawford, a neonatologist, and Dr. Zane Brown, a maternal-fetal medicine specialist. The Defendants' disclosure included Dr. Jay Goldsmith, a neonatologist, as one of their experts who would testify that Dr. Robinson and the Hospital nursing staff complied with the standard of care. The disclosure also indicated that Dr. Goldsmith reserved the right to form additional opinions based on other experts' depositions.

In March 2010, the parties deposed Dr. Crawford, the Rieses' expert, who briefly discussed equilibration — the process by which the cardio-vascular system takes fluids from other parts of the body to compensate for lost blood — and the level of hemoglobin in Lauren's blood.[2] In April 2010, the parties deposed Dr. Goldsmith. Dr. Goldsmith opined that Lauren's blood loss occurred before she arrived at the Hospital because equilibration takes two to four hours and Lauren's hemoglobin levels were diluted at birth. In his opinion, this suggested that her body had time to draw fluids (which do not contain hemoglobin) from her other tissues after her blood loss occurred. Dr. Goldsmith noted that if Lauren had bled at the Hospital immediately prior to

---

[2] "Hemoglobin is the protein contained in red blood cells that is responsible for delivery of oxygen to the tissues. To ensure adequate tissue oxygenation, a sufficient hemoglobin level must be maintained." Walker HK, et al., editors. *Hemaglobin and Hematocrit*, CLINICAL METHODS: THE HISTORY, PHYSICAL, AND LABORATORY EXAMINATIONS. 3rd edition. (1990). https://www.ncbi.nlm.nih.gov/books/NBK201/.

4

delivery, her body would not have had time to equilibrate and her hemoglobin levels would not have been diluted.

The Rieses disputed Dr. Goldsmith's testimony from the beginning of the case. Dr. Goldsmith's calculation, discussed in detail in the April deposition, rested on the assumption that fetuses have the same equilibration rate as adults and children, despite his inability to point to specific studies to support his theory.[3] When the deposition resumed one month later, in May 2010, Dr. Goldsmith revealed that he could not find any studies proving that fetuses equilibrate at the same rate as post-birth humans. He noted that such research, which would require intentionally causing fetuses to bleed to measure their equilibration rate, would be unethical.

On July 12, 2010, the Rieses filed a supplemental expert witness disclosure stating that one of their previously disclosed experts, Dr. Brown, would testify about the equilibration rate of fetuses and his opinion that fetal equilibration rates differ from child and adult equilibration rates.[4] Three days earlier, during her second deposition on July 9, 2010, Dr. Crawford had strongly disagreed with Dr. Goldsmith's equilibration calculation and determination of when Lauren's lowest hemoglobin levels occurred. Dr.

---

[3] Dr. Goldsmith's calculations involved a mathematical formula that utilized total blood volume, hematocrit level, hemoglobin level, and the rate of equilibration of a human fetus. Hematocrit is a measurement comparing the number of red blood cells to total blood volume, revealing whether a person has a normal amount of red blood cells, too many, or too few. Walker, *supra* note 2.

[4] That disclosure is quoted verbatim and discussed *infra*.

Crawford indicated that she would testify about her disagreement with Dr. Goldsmith if questioned at trial.

On July 12, 2010, the Rieses also filed a motion *in limine* seeking to exclude Dr. Goldsmith's equilibration testimony altogether because it was not specifically mentioned in his expert witness disclosure. In addition, the Rieses sought to exclude testimony about nucleated red blood cells (NRBCs) from another expert witness (Dr. Thomas Strong, Jr.)[5] for the same reason. After a brief hearing on August 11, the trial court denied the motion to exclude Dr. Goldsmith's testimony but ordered that the Rieses could obtain an additional expert to rebut the NRBC testimony because they did not have an expert on that subject. On August 26, 2010, the Rieses added Dr. Jeffrey Phelan as an expert witness. Notably, the disclosure stated that Dr. Phelan would testify about NRBCs and also Dr. Goldsmith's equilibration calculations, despite the trial court's limitation on the new expert.

The jury trial began on August 31, 2010. Prior to Dr. Phelan's testimony, the Rieses informed the trial court that they intended to elicit testimony from him regarding NRBCs and Dr. Goldsmith's equilibration calculation. The Defendants objected and reminded the trial judge of the prior ruling that Dr. Phelan, the new witness, would be limited to testifying about NRBCs. The trial court agreed with the Defendants and noted that the Rieses had other witnesses who could testify about equilibration. After the trial court limited Dr.

---

[5] Dr. Strong was deposed in June 2010.

6

Phelan's testimony, for reasons unknown, the Rieses did not ask either Dr. Crawford or Dr. Brown to testify at trial about Dr. Goldsmith's equilibration calculation.

Prior to Dr. Goldsmith's testimony at trial, the Rieses moved for a Daubert[6] hearing on the reliability of his calculations. They argued that Dr. Goldsmith's opinion was not supported by studies showing that the fetal equilibration rate is the same as in post-birth humans. The Defendants responded by providing studies regarding the equilibration rate in fetal sheep, which were consistent with Dr. Goldsmith's position, and by also arguing that the Rieses' mid-trial Daubert challenge was untimely. After considering the arguments, the trial court agreed with the Defendants that the Rieses' challenge was untimely. He further determined that Dr. Goldsmith's testimony was appropriate under Daubert and that the Rieses' argument went to the weight, rather than the admissibility, of the testimony. However, the trial court prohibited Dr. Goldsmith from referring to the sheep studies, which he had not previously produced.

Throughout the trial, the jury heard testimony from numerous treating and expert medical witnesses. Some testified that Lauren was irreparably injured before she arrived at the Hospital, and others testified she was injured by the Defendants' actions or inactions. Others concluded that it was impossible to say for certain. The witnesses based their timing on a variety of

---

[6] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

7

factors, including scans of Lauren's brain, examination of Billie Jo Ries's placenta and umbilical cord, Lauren's heart rate, and blood analysis. After considering all of this evidence in a four-week trial, the jury returned a unanimous verdict in favor of the Defendants.

The Rieses appealed, raising two arguments: (1) that the trial court abused its discretion by admitting Dr. Goldsmith's scientifically unreliable equilibration testimony; and (2) the trial court abused its discretion by refusing to allow Dr. Phelan to rebut Dr. Goldsmith's equilibration testimony. The Court of Appeals unanimously agreed with the Rieses that Dr. Goldsmith's equilibration testimony should have been excluded. The appellate panel found that Dr. Goldsmith's opinion was not supported by reliable scientific proof and, even if the Rieses' *Daubert* challenge was inadequately raised at the trial court, the admission of Dr. Goldsmith's testimony constituted palpable error, requiring reversal. That appellate court concluded there was a reasonable possibility that the jury would have returned a different verdict absent Dr. Goldsmith's equilibration calculations. Having reversed the trial court as to the Rieses' first argument, the Court of Appeals declined to address the second argument regarding Dr. Phelan's testimony.

The Defendants appealed,[7] arguing that the Court of Appeals impermissibly substituted its findings for that of the trial court as to Dr.

---

[7] Dr. Robinson and her practice group were originally parties to the first appeal to the Court of Appeals, but subsequently entered a settlement agreement with the Rieses after the Court of Appeals rendered its first opinion. Additionally, the Rieses originally named Baptist East Hospital as a defendant but these two parties entered an agreed order of dismissal after trial, simultaneously with the circuit court's entry of

Goldsmith's testimony. This Court reversed, finding that Dr. Goldsmith's equilibration calculation was adequately supported and was therefore admissible under *Daubert.* 460 S.W.3d at 889-904. This Court also held that even if the trial court had erred by admitting the testimony, the error was harmless because numerous witnesses testified that Lauren began bleeding before she arrived at the Hospital and this other evidence was sufficient to support the jury's verdict. Because this Court found no error in the admission of Dr. Goldsmith's testimony, we remanded to the Court of Appeals for consideration of the second issue raised by the Rieses on appeal, *i.e.,* the limitations on Dr. Phelan's expert testimony.

On remand, this case was assigned to the same Court of Appeals' panel that issued the first decision. In a 2-1 decision, the Court of Appeals found that the trial court unfairly prejudiced the Rieses by: (1) allowing Dr. Goldsmith to testify about his equilibration calculation despite the Defendants' failure to disclose the calculation in their initial or supplemental expert witness disclosures; and (2) prohibiting Dr. Phelan from rebutting Dr. Goldsmith's equilibration calculation. The appellate panel determined that the trial court "seriously and adversely impacted" the Rieses' ability to prepare their case for trial and that the resulting prejudice required reversal.

---

a judgment consistent with the jury verdict. Therefore Dr. Robinson, her practice, and Baptist East Hospital are no longer parties to this appeal. The only remaining parties are Dr. Richard Oliphant and his practice group, Louisville Physicians for Women, PLLC. However, to avoid confusion, these parties will continue to be referenced as "the Defendants."

Judge Clayton dissented, reasoning that the Rieses' ability to prepare for trial was not impaired by a lack of formal disclosure because Dr. Goldsmith revealed his equilibration calculation during his depositions (in April and May), which occurred approximately four months before trial. Additionally, the Rieses had other previously disclosed experts (Drs. Crawford and Brown) who could have testified in rebuttal regarding Dr. Goldsmith's calculations.

We granted discretionary review to determine whether the trial court erred in limiting Dr. Phelan's testimony to NRBCs, thereby precluding him from rebutting Dr. Goldsmith's equilibration calculations. Finding that the Rieses were aware of Dr. Goldsmith's testimony for approximately four months before trial, and that they had other witnesses who were expected to, and would have been allowed to, testify about the equilibration calculations, we see no error in the trial court's ruling limiting the testimony of a new expert named five days before trial, and no prejudice justifying a new trial. Accordingly, we reverse the Court of Appeals and reinstate the judgment of the trial court.

## ANALYSIS

The sole issue before us is whether the trial court erred by limiting Dr. Phelan's testimony to NRBCs and not allowing him to provide testimony rebutting Dr. Goldsmith's equilibration calculations. "[Q]uestions concerning the scope of evidence are left to the discretion of the trial court to determine whether to admit and exclude evidence." *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 684 (Ky. 2005). An appellate court reviews a trial court's decision to limit expert testimony for an abuse of discretion. *Id.* The

10

trial court abuses its discretion when the "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* After reviewing the record, we find no abuse of discretion and thus no error requiring a new trial.

## I.   The trial court did not err in limiting Dr. Phelan's testimony to NRBCs.

In a pretrial conference on August 11, 2010, after the trial court denied the Rieses' July 12, 2010 motion to exclude Dr. Goldsmith's equilibration calculation testimony and Dr. Strong's NRBC testimony, the trial court ruled that the Rieses would be allowed to supplement their proof with an existing or new witness to respond to the NRBC testimony. In compliance with the trial court's ruling, the Rieses named Dr. Phelan as an expert witness in a disclosure on August 26, 2010, five days before the start of trial. The disclosure stated that Dr. Phelan would refute Dr. Strong's opinions on the timing of the injury based on NRBCs, and also rebut Dr. Goldsmith's equilibration calculations for timing the fetal bleed and Lauren's injuries. The Defendants objected that the Rieses had exceeded the trial court's ruling by offering Dr. Phelan as an equilibration calculation expert.

In a fifty-minute hearing on September 1, 2010, the parties addressed the scope of Dr. Phelan's testimony and the trial court heard extensive arguments from both sides. The trial court recognized that allowing the Rieses to bring in a new expert that late in the proceedings was an "extraordinary decision" falling "very heavily" on the Defendants, and ultimately reiterated that Dr. Phelan would be limited to testifying about NRBCs. On September 9, 2010,

11

the Rieses filed another amended expert disclosure, which again stated that Dr. Phelan would dispute Dr. Goldsmith's mathematical calculations used to time Lauren's injuries. The trial court conducted yet another hearing on September 10, 2010, where the Rieses once again argued that Dr. Phelan should be permitted to rebut both Dr. Strong's NRBC opinions and Dr. Goldsmith's calculations.

At this third hearing, the Rieses argued that Dr. Strong's initial expert disclosure did not indicate that he would testify as to causation, but at his deposition he stated that the NRBCs and Lauren's blood count after delivery suggested that the injury happened before she arrived at the Hospital. The Rieses also stated that theories on NRBCs involve looking at other factors in addition to NRBC counts. Notably, the trial court asked Rieses' counsel whether her other witnesses dealt with those other factors and she acknowledged that they did. After hearing arguments, the trial court reiterated its decision to limit Dr. Phelan's testimony to NRBCs. The trial court noted that if the Rieses had an absolute absence of proof on the other factors, *e.g.*, equilibration, it may have ruled in the Rieses' favor, but that there were other, previously identified witnesses that could testify to that effect.[8] The trial court stated that the Rieses had "come up short" because of the late disclosure on

_____

[8] Dr. Crawford had testified in her second deposition that she would testify at trial on equilibration and the July supplemental disclosure for Dr. Brown indicated that he would also testify on that subject.

12

the NRBC issue, making it fair to limit the new witness's testimony to that issue alone.

The Court of Appeals held that the Defendants violated Kentucky Rules of Civil Procedure (CR) 26.02 and CR 26.05 by failing to seasonably supplement Dr. Goldsmith's disclosure with his equilibration calculations timing Lauren's in utero bleed. However, we see no violation. CR 26.02(4)(a)(i) requires parties to

> identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Subsection (4)(a)(ii) of that rule provides in pertinent part:

> After a party has identified an expert witness in accordance with paragraph (4)(a)(i) of this rule or otherwise, any other party may obtain further discovery of the expert witness by deposition upon oral examination or written questions pursuant to Rules 30 and 31.

CR 26.05(a) requires a party to "seasonably supplement" his CR 26.02 expert witness disclosures.

The Defendants initially disclosed Dr. Goldsmith as an expert nearly eight months before trial, and their disclosure provided the subject matter of his testimony and the substance of his opinions, as required by CR 26.02. Importantly, the disclosure stated that "Dr. Goldsmith reserves the right to form additional opinions following the deposition of Carolyn Crawford [the Rieses' neonatology expert] and based upon any additional discovery taken subsequent to this disclosure."

13

Dr. Crawford was deposed twice. During her first deposition on March 24, 2010, Dr. Crawford was asked on cross-examination to provide her opinions regarding calculations of blood loss, equilibration, and the timing of the bleed. Although counsel for Dr. Robinson, the questioner at that point in the deposition, did state, as the Rieses emphasize, "I'm not going to play my trump card today," the Rieses' counsel immediately responded, "We know what it is." Thus, the record supports that on March 24, 2010, the Rieses' counsel likely knew that equilibration and the timing of the bleed would be a focus of the Defendants' expert testimony. If there were doubts, one month later at Dr. Goldsmith's deposition, he testified about the timing of the bleed, equilibration, and his calculations, meaning the equilibration issue and Dr. Goldsmith's intended testimony were known to all parties no later than April 23, 2010, more than four months prior to trial.

Dr. Crawford's second deposition occurred on July 9, 2010, and she stated that she strongly disagreed with Dr. Goldsmith's opinions on equilibration, which he had offered in the two intervening depositions in April and May. Specifically, she stated that the only studies about equilibration rate in utero were related to sheep not humans, and that she believed equilibration in utero differed from equilibration in the first week of life. Further, Dr. Crawford stated that she vigorously disagreed with Dr. Goldsmith about Lauren's hemoglobin and hematocrit.

One of the main purposes of CR 26.02 is to secure information regarding the existence of evidence that may be used at trial. *Maddox v. Grauman*, 265

14

S.W.2d 939, 941 (Ky. 1954). Dr. Goldsmith's 366 pages of deposition testimony (taken in April and May before the trial that started on August 31) adequately informed the Rieses to expect the equilibration calculations as evidence at trial, and they appeared to be preparing to contest it with Dr. Crawford. Dr. Crawford testified at the four-week trial and could have addressed this topic then, but she did not.

Despite what the record reflects, the Court of Appeals found that the Defendants' "failure to seasonably disclose the new calculations and timing opinions of Dr. Goldsmith [by formally supplementing their witness disclosure] 'seriously undermined' the Rieses' ability to prepare their case for trial." We disagree. Dr. Goldsmith provided September trial testimony in line with his deposition testimony, given in April and May. Although the Rieses characterized both Dr. Goldsmith's equilibration calculation testimony and Dr. Strong's NRBC testimony as "new expert opinions" and "new topics" that they had to find, disclose, and produce a supplemental expert to rebut at trial, this is a mischaracterization because there was nothing "new" about Dr. Goldsmith's testimony. While Dr. Strong's June deposition testimony regarding NRBCs was arguably "new," Dr. Goldsmith presented his mathematical information in his initial April deposition, more than four months before trial.

As outlined *supra*, the Rieses' expert, Dr. Crawford, seemingly was ready to address equilibration calculations, as reflected by her disagreement with Dr. Goldsmith in her July deposition. Moreover, Dr. Brown, the Rieses' maternal-

15

fetal medicine specialist, initially disclosed in November 2009, was the subject

of the following July 12, 2010 supplemental disclosure:

> Dr. Brown will testify that following delivery, it has been his experience that the placenta will contain in the neighborhood of 150 ccs of blood. It is his opinion that the entire circulating blood supply of a 2 kilogram baby while *in utero* would be in the range of approximately 250 to 300 ccs.
>
> The defense experts who have opined on the equilibration and compensation of an *in utero* fetus have not been able to provide any peer reviewed studies or other support for their opinions regarding equilibration and compensation. It is Dr. Brown's opinion that the physiological state of an *in utero* fetus is significantly different from that of a neonate, a child or that of an adult. A fetus suffering a loss of blood volume will both equilibrate and compensate for that blood loss in ways that are substantially different from neonates, children and adults.
>
> Dr. Brown has not yet had a full opportunity to review all defense expert depositions, as such, Plaintiffs reserve the right to present rebuttal opinions and/or testimony from Dr. Brown about any and all opinions Defendants' experts gave in deposition.

Clearly, the Rieses had two previously identified experts who were capable of

addressing the equilibration testimony of Dr. Goldsmith.[9]

---

[9] The Court of Appeals stated that, despite arguments that the Rieses could have called Dr. Brown to rebut Dr. Goldsmith's testimony, the above disclosure reveals that Dr. Brown was not disclosed as offering his opinion contradicting Dr. Goldsmith's calculations. However, Dr. Goldsmith's opinion and calculations rested on the assumption that fetuses equilibrate at the same rate as adults and children, and Dr. Brown's supplemental disclosure states that a fetus "equilibrate[s] and compensate[s] for that blood loss in ways that are substantially different from neonates, children and adults." Plainly, Dr. Brown intended to contradict Dr. Goldsmith's testimony. Further, if Dr. Brown was not capable of rebutting Dr. Goldsmith's theory, then there was no need for the Rieses to supplement his expert disclosure to specifically allow him to do so.

16

The Court of Appeals focused on the Defendants' failure to file post-depositions supplemental disclosures per CR 26.05 of Dr. Goldsmith's opinions as to his calculations used to time Lauren's in utero bleed and treated this failure as a violation of the letter and spirit of CR 26.02 and 26.05. The Rieses sought to exclude Dr. Goldsmith's equilibration calculation for the very same reason in the July 12 motion *in limine*, but the circuit court appropriately denied that motion. This Court has held that "the person requesting exclusion of testimony must show prejudice." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). We cannot find prejudice when the record reflects there was complete pretrial disclosure about Dr. Goldsmith's equilibration calculations in his initial April deposition and again in a second deposition in May scheduled at the request of the Rieses' counsel.[10]

As for the witness disclosures found in the record, in addition to the initial December 2009 disclosure for Dr. Goldsmith, the Defendants provided a supplemental expert witness disclosure under CR 26.02 on July 15, 2010. The disclosure stated that Dr. Goldsmith would address any issue brought forth in the continued discovery since his initial disclosure and depositions and would rebut any testimony offered by Appellees' experts. This disclosure was filed

---

[10] Dr. Robinson's counsel made Dr. Goldsmith available for the second deposition. The record is not altogether clear about the reasons for a second deposition. However, as one of the Defendants' counsel noted at the September 10 hearing before the trial court, it was "disingenuous" for the Rieses' counsel to characterize equilibration as a "new issue" in the case because the issue was discussed in detail in a Goldsmith's April deposition .

17

more than a month before the first day of trial. While it is true that the supplemental disclosure did not contain specific information, there was no need for the Defendants to include every detail of Dr. Goldsmith's testimony to date in the disclosure, testimony reflected in 366 pages of transcript at two depositions taken by the Rieses' counsel. Dr. Goldsmith testified in detail in his depositions about his calculations, and the supplemental disclosure appropriately encompassed those opinions by reference.

Simply put, requiring a party to supplement an expert witness disclosure every time an expert is deposed in discovery would be a waste of the party's time and resources. Depositions serve the same function as CR 26.02 and 26.05 — to reveal evidence, information and opinions that may be used at trial and they are universally recognized as the most effective, detailed method of obtaining an understanding of an opponent's proof. The rules of discovery are in place to level the playing field and ensure a fair trial, not to create procedural traps. Mandating that parties summarize and disclose the entirety of a deposition in a formal CR 26 supplemental disclosure would be burdensome and counterproductive, potentially creating more opportunities for dispute. A supplemental disclosure that simply incorporates expert witness depositions by reference serves the same purpose, but in an easier, more efficient, and more logical way.

"Pretrial discovery simplifies and clarifies the issues in a case; eliminates or significantly reduces the element of surprise; helps to achieve a balanced search for the truth, which in turn helps to ensure that trials are fair . . . ."

18

*LaFleur v. Shoney's, Inc.*, 83 S.W.3d 474, 478 (Ky. 2002). The expert disclosures in this case were proper and accomplished the purpose behind CR 26.02 and the ensuing discovery — multiple depositions — adequately prepared both sides for a fair trial. The trial court's ruling disallowing testimony on equilibration calculations by the newly-named Dr. Phelan was not an abuse of discretion but rather a wholly reasonable decision in light of all the circumstances. The Court of Appeals erred in holding otherwise.

## II. Even if the trial court erred in limiting Dr. Phelan's testimony, that error was harmless.

Although the trial court did not err in limiting Dr. Phelan's testimony, even if it were an error, it was harmless in light of the numerous other experts who testified as to the timing of the fetal bleed. As our rule states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

CR 61.01. "A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009). "The inquiry is not simply whether there was enough evidence to support the result . . . [i]t is rather, even so, whether the

19

error itself had substantial influence." *Id.* at 689. The limitation on Dr. Phelan's testimony, even if error, had no substantial influence on the case.

A central issue in this case was the timing of the fetal bleed; the Defendants arguing that the bleed happened at home and the Rieses arguing that the bleed occurred at the Hospital. As noted in this Court's previous opinion, Dr. Goldsmith used his calculations as one of the bases for his opinion which, among many other things, considered Lauren's decreased heart rate, kidney function test results, and pathology findings. *Oliphant*, 460 S.W.3d at 894. Additionally, six other physicians testified to their opinions that the fetal bleed began at home. *Id.* at 894-96. Furthermore, the medical records indicated that there was not a significant amount of blood while Billie Jo Ries was in the Hospital, other than during her C-section. In sum, there was sufficient, indeed substantial, evidence outside of Dr. Goldsmith's opinions to support the jury's verdict in favor of the Defendants.

Given all the evidence regarding the timing of the fetal bleed, we cannot find limiting Dr. Phelan's testimony to NRBCs, had a "substantial influence" on the outcome of the trial. *Winstead*, 283 S.W.3d at 689. "The trial judge has wide discretion to admit or exclude evidence including that of expert witnesses." *Baptist Healthcare*, 177 S.W.3d at 680. Here the trial court understood that the Rieses had "come up short" in the face of Dr. Strong's testimony on NRBCs, so it allowed an eleventh-and-a-half hour witness, all while recognizing that allowing Dr. Phelan to testify at all was an

20

"extraordinary decision" that fell "very heavily" on the Defendants.[11] The trial court was in the best position to make the determination, and the trial court exercised its discretion in an appropriate manner. Even if this Court could conclude that the trial court erred in limiting Dr. Phelan's testimony, the error would be harmless in light of the cumulative nature of extensive trial testimony regarding the timing of the fetal bleed.

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and reinstate the trial court's judgment.

Minton, C.J.; Keller, Lambert, VanMeter, and Wright, JJ., sitting. All concur.


COUNSEL FOR APPELLANTS:

Gerald R. Toner
Katherine K. Vesely
Whitney Roth Kramer
O'BRYAN, BROWN & TONER, PLLC


COUNSEL FOR APPELLEES:

Ann B. Oldfather
Robert Sean Deskins
OLDFATHER LAW FIRM

---

[11] Dr. Phelan was disclosed five days before trial (August 26, 2010) and his deposition was taken mid-trial, on September 12, the day before his trial testimony.

COUNSEL FOR AMICUS CURIAE,
KENTUCKY DEFENSE COUNSEL, INC.:

David V. Kramer
Michael Enzweiler
DRESSMAN BENZINGER LAVELLE PSC