RENDERED: DECEMBER 23, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-0986-MR

MILLS, SHERMAN, GILLIAM & GOODWIN, P.S.C.;
AND DIANNA HULL PERAZZO, M.D.          APPELLANTS


|  | APPEAL FROM KENTON CIRCUIT COURT |
|---|---|
| v. | HONORABLE PATRICIA M. SUMME, JUDGE |
|  | ACTION NO. 11-CI-02391 |


MELANIE ROBBINS,
BY AND THROUGH HER GUARDIAN
AND FATHER, LARRY ROBBINS; AND
TYLER WILLIAM MICHAEL BULMER, A
MINOR, BY AND THROUGH HIS NEXT FRIEND
AND NATURAL FATHER AND PARENT, TODD
WILLIAM BULMER          APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; GOODWINE AND MCNEILL,
JUDGES.

CLAYTON, CHIEF JUDGE:  Dr. Dianna Hull Perazzo appeals from a judgment of the Kenton Circuit Court following a trial wherein the jury returned a verdict in favor of Melanie Robbins and against Dr. Perazzo for over $4 million dollars.  Dr. Perazzo alleges that the trial court abused its discretion regarding certain evidentiary rulings it made both before and during the trial and contends that the trial court improperly limited certain expert witness testimony, abused its discretion in excluding evidence of drug and alcohol use, and committed cumulative error.  Upon review of the record and applicable caselaw, we affirm.

## BACKGROUND

On September 15, 2010, Melanie Robbins – at that time, 35 years of age – went to the St. Elizabeth Medical Center ("SEMC") emergency room (the "ER") with complaints of a headache and congestion.  Robbins indicated that her headache was a "10 out of 10" on the pain scale and "the worst headache of her life."  Robbins further told the ER workers that the headache began a few days to a week prior and was particularly bad when she coughed or bent over.  Robbins also described having nausea, vomiting, and light and sound sensitivity.

Robbins was assessed by Dr. Perazzo, an ER physician, who ordered a CT head scan.  The radiologist reading the x-ray from such head scan, Dr. Kirk Doerger, found no hemorrhage or other abnormality and mistakenly concluded that the x-ray was normal.  In fact, the x-ray indicated that Robbins was experiencing a

"warning bleed" or a "sentinel bleed" signaling an imminent hemorrhagic stroke. Dr. Perazzo did not order any further tests, including a lumbar puncture ("LP"), which is a test for the existence of red blood cells in the spinal fluid and is indicative of a brain bleed that a CT scan is at times not sensitive enough to reveal. Robbins remained at the ER until midnight, at which time she indicated that her headache had improved. Dr. Perazzo discharged Robbins with a short period of pain medication and a request to schedule a follow-up appointment.

On September 27, 2010, Robbins returned to the ER after an aneurysm – or a flaw in the wall of a blood vessel in her brain – ruptured and she suffered a stroke. A subsequent CT scan showed "an extensive subarachnoid hemorrhage [("SAH")]," which translates to bleeding in the area between the brain and the tissue covering the brain. The CT scan further showed a "dissecting aneurysm," a type of aneurysm that presents in only three to five percent of all brain aneurysms. Specifically, a "dissecting" aneurysm describes a situation where blood penetrates the first of three layers contained in the blood vessel wall and goes into the second layer, ultimately separating or tearing the vessel wall. Robbins' dissecting SAH was in the middle cerebral artery ("MCA"), one of three major arteries channeling fresh blood to the brain.

Robbins was thereafter transferred to University of Cincinnati Hospital where neurosurgeon Dr. Andrew Ringer performed surgery to reconstruct

the blood vessel. At the beginning of the surgery, Dr. Ringer placed a "temporary clip" across the MCA in order to "shut off all the blood flow to the right side of the brain for a period of time." After working to rebuild the vessel, when Dr. Ringer removed the temporary clip, the aneurysm began to bleed. Dr. Ringer identified one part of the MCA, the M1 segment, and placed a temporary clip on such segment as well as "a straight clip across the base of the aneurysm incorporating the superior division, leaving the distal clip in place." Such action stopped the bleeding, and Dr. Ringer concluded the surgery.

Robbins subsequently underwent a second surgery on September 30, 2010, as her brain began swelling with bleeding into the temporal lobe. Ultimately, Robbins suffered from almost total paralysis, and requires 24-hour-a-day, 7-day-per-week care.

Robbins sued SEMC, Dr. Perazzo and her clinic, and Dr. Doerger and his clinic. Robbins settled with SEMC before trial and, after approximately six years of litigation, her case against Dr. Perazzo and Dr. Doerger was tried over fifteen days in March of 2017. Specifically, Robbins argued that the symptoms that she was presenting on her September 15, 2010 ER visit were signs of an SAH and that Dr. Perazzo should have ordered an LP despite receiving a normal report from Dr. Doerger. On the other hand, Dr. Perazzo argued that Robbins did not have a traditional presentation of SAH because Robbins did not have a

"thunderclap" headache, but rather indicated that her headache had been going on for approximately a week.

The jury ultimately awarded Robbins $1,268,621.67 for medical expenses, $6 million dollars for future care and treatment, and $1 million dollars for pain and suffering. The jury apportioned fault 50% to Dr. Perazzo and 50% to Dr. Doerger. A judgment was entered accordingly.

Dr. Perazzo and Dr. Doerger filed motions for a new trial and judgment notwithstanding the verdict, both of which the trial court denied. Dr. Doerger paid his portion of the judgment, while Dr. Perazzo appealed to this court as a matter of right.

Further facts will be discussed as they become relevant in the course of this opinion.

## ISSUES

Dr. Perazzo argues that the trial court erred in limiting the testimony of an expert witness, Dr. Patrick McCormick, to those opinions the trial court found to have been disclosed in his Kentucky Rule of Civil Procedure (CR) 26.02(4) expert witness disclosure. Dr. Perazzo further argues that the trial court erroneously excluded evidence of Robbins' alleged alcohol and cocaine use. Finally, Dr. Perazzo argues that the cumulative error doctrine requires a new trial based on the trial court's allegedly unfair evidentiary rulings.

## ANALYSIS

### a. Standard of Review

An appellate court utilizes the abuse of discretion standard when reviewing a trial court's decision regarding the admissibility of evidence. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577-78 (Ky. 2000). The same abuse of discretion standard applies to discovery matters. *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky. App. 2006). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Thompson*, 11 S.W.3d at 581.

### b. The Trial Court's Exclusion of Portions of Dr. McCormick's Testimony

Dr. Perazzo first argues that the trial court abused its discretion when it limited Dr. McCormick to those opinions that the trial court found had been disclosed in Dr. McCormick's CR 26.02 expert witness disclosure. In this case, the trial court also specifically prohibited "any expert opinion not disclosed in the filed disclosures or during discovery of the expert witness." CR 26.02(4)(a)(i) states as follows:

> Discovery of facts known and opinions held by experts, . . . acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: . . . A party may through interrogatories require any other party to

identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Additionally, CR 26.05(a) requires a party to "seasonably . . . supplement" his CR 26.02 expert witness disclosures.

Dr. McCormick was initially disclosed as a witness for SEMC before it settled with Robbins. The relevant portions of Dr. McCormick's expert disclosure stated as follows:

> Dr. McCormick will testify that he agrees with Dr. Samson's description of the aneurysm. He agrees and will opine that it was a multi-lobed, partially-thrombosed, ruptured aneurysm with a complex origin at or near the right middle cerebral artery bifurcation.
>
> Dr. McCormick will testify that if the aneurysm suffered by Ms. Robbins was diagnosed as a Grade 1 on the Hunt Hess Scale at the time of the first presentation to [SEMC], because of the location and complexity of the aneurysm as described by Dr. Samson, even if it was diagnosed and treated on September 15, 2010, Ms. Robbins' *likely outcome* would be similar to those patients presenting as a Grade 3 or Grade 4. He will also testify that he agrees with Dr. Samson that dissecting aneurysms of the cerebral arteries are notoriously fragile and unstable, even prior to rupture. He further agrees and will opine that dissecting aneurysms of the cerebral arteries such as the one suffered by Ms. Robbins are prone to bleed vigorously intra-operatively and, in order for the surgeon to effectively treat the condition, compromise or even closure of arterial branches potentially essential to the brain's normal blood supply

may be necessary. In light of this fact, the *risk* to Ms. Robbins of neurological deficits, even if the aneurysm was identified prior to rupture, *was significant*. The *risk* of bleeding or stroke post-procedure resulting in permanent neurological deficits *was also significant.*

Although Dr. McCormick's deposition was never taken, Dr. Doerger called Dr. McCormick as an expert witness to testify at trial on March 29, 2017. At that point in the trial, Dr. Perazzo had already closed her proof and had rested her case the previous day. As his testimony progressed, it became evident that Dr. McCormick planned to testify that Robbins' injuries were not caused by the original hemorrhage that went undetected by Dr. Perazzo, but were caused by Dr. Ringer having to "sacrifice" certain vessels to stop bleeding during the surgery. Upon Robbins' counsel's objection, the trial court allowed Dr. McCormick to testify by avowal, wherein he stated:

> [M]y opinion in this case has always been that the outcome that Melanie experienced is related to the type of aneurysm she had. If this aneurysm was diagnosed on September 15th or back in May, um, they would have been faced with treating this exact same problem, and it's treating this problem that led to the outcome Melanie had. Even if it had never hemorrhaged, she, to a probability, would have the neurologic problems that she has now[.] What caused the problem was the fact that you had to treat this aneurysm, and in treating it, the only solution Dr. Ringer could come up with was to sacrifice that vessel, and in sacrificing that vessel there are consequences. And that's what led to the stroke that she had, that's what led to the emergency return to the operating room to remove a whole portion of the skull, which is a treatment for stroke, not a treatment for

-8-

aneurysm. They never anticipated that or they would have done it at the first surgery. That's what caused all the problems here.

After Dr. McCormick testified by avowal, the following exchange occurred:

Robbins' Counsel: It's not disclosed, your honor.

Trial Court: How come I don't have a clear disclosure of this? I mean, no offense intended, cause I don't care what the medicine says, but I do care about how everybody gets to deal with the medicine in front of the jury.

Ultimately, the trial court limited Dr. McCormick's testimony to the information contained in his expert disclosure.

As a preliminary matter, Robbins first argues that this issue was not adequately preserved at the trial court level, as Dr. Perazzo had already rested her case when Dr. Doerger called Dr. McCormick to testify and requested that Dr. McCormick's opinion be admitted at trial. However, because in her pretrial list of experts Dr. Perazzo expressly adopted the experts of the other defendants and reserved the right to call them at trial, and because "the substance of the evidence was made known to the court by offer" via Dr. McCormick's avowal testimony, we believe the argument was sufficiently preserved for our review. *See* Kentucky Rule of Evidence (KRE) 103(a)(2).

Therefore, we are left with the task of determining whether the trial court abused its discretion when it limited Dr. McCormick's testimony to the

specific opinions expressed in his expert witness disclosure. Again, "questions concerning the scope of evidence are left to the discretion of the trial court to determine whether to admit and exclude evidence." *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 684 (Ky. 2005) (citation omitted).

We agree with the trial court that the opinion offered by Dr. McCormick at trial is significantly broader than that described in his expert disclosure. The disclosure's language discussed Dr. McCormick's opinion in terms of "risks" and "likely outcomes" of the surgery to treat the aneurysm, whereas Dr. McCormick's avowal testimony was that the treatment of the aneurysm directly led to the outcome that Melanie experienced and was the actual, rather than likely, outcome. Instead of limiting Dr. McCormick to testimony regarding significant "risks," Dr. Doerger's counsel attempted to introduce a new causation opinion from Dr. McCormick at trial. The variance between the substance and level of certainty in Dr. McCormick's expert disclosure opinion and his avowal testimony at trial was significant. Indeed, "[a] generalized statement outlining a broad subject matter about which an expert may testify does not sufficiently apprise the other party of the information needed to prepare for trial as contemplated and mandated by the notice requirements of CR 26.02(4)(a)." *Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 393-94 (Ky. App. 2004).

-10-

While Dr. Perazzo cites us to the case *Oliphant v. Ries*, 568 S.W.3d 336 (Ky. 2019), we do not find such case to be applicable to the one *sub judice*. In *Oliphant*, the applicable expert had been extensively deposed twice, at which time his opinion had been revealed. *Id*. at 343-44. The Court stated:

> Simply put, requiring a party to supplement an expert witness disclosure every time an expert is deposed in discovery would be a waste of the party's time and resources. Depositions serve the same function as CR 26.02 and 26.05 — to reveal evidence, information and opinions that may be used at trial and they are universally recognized as the most effective, detailed method of obtaining an understanding of an opponent's proof.

*Id*. at 345. The foregoing situation is not present in this case.

As a result, although one may have read and interpreted the expert disclosure in a different or more expansive manner, we cannot say that the trial court's interpretation was arbitrary or unreasonable. Because Dr. Perazzo failed to fully supplement Dr. McCormick's prior expert disclosures, the trial court acted within its discretion in excluding the evidence. *See Kemper v. Gordon*, 272 S.W.3d 146, 155 (Ky. 2008).

Further, even if we found that Dr. McCormick's expert disclosure was adequate, the Kentucky Supreme Court has held that "the person requesting exclusion of testimony must show prejudice." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). We can find no prejudice here, as Dr. Perazzo provided her own causation expert, Dr. Close. The jury heard Dr.

Close opine that Robbins would have undergone the exact same procedure had she been diagnosed by Dr. Perazzo on September 15, 2010 that she ultimately underwent. Dr. Close further opined that, even if Dr. Perazzo had diagnosed Robbins on September 15, 2010, the risk of death or permanent disability resulting from the surgery would be "above fifty percent." Dr. Close also testified that at the time of the surgery on September 27, 2010, the risk of neurological disability from such surgery was "well above fifty percent, one could argue it's a hundred percent." Therefore, the jury heard causation expert testimony beneficial to Dr. Perazzo's position, and we find no prejudice.

### c. **The Trial Court's Exclusion of Evidence of Drug and Alcohol Use**

Dr. Perazzo next argues that the trial court erred when it excluded certain evidence of Robbins' alleged drug and alcohol use. Dr. Perazzo argues that evidence of drug and alcohol abuse went to the causation of Robbins' injuries, as cocaine adversely affected SAH treatment and recovery. Dr. Perazzo also contends that such evidence could also affect the applicable standard of care in terms of the diagnostic approach. On the other hand, Robbins argues that the evidence was irrelevant under the definition provided by KRE 401 and therefore inadmissible under KRE 402.

KRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 402 states that "[e]vidence which is not relevant is not admissible." Further, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

Dr. Perazzo offered as evidence of Robbins' alleged drug and alcohol use a positive test for cocaine on a 2007 drug screen at St. Luke Hospital for acute alcohol intoxication. Further, Dr. Perazzo offered arrest records from the summer of 2010 after police found cocaine at Robbins' boyfriend's home. The resulting charges were ultimately dismissed against Robbins, however, as there was no evidence that Robbins had any connection to the substances. Dr. Perazzo also shared a Facebook message in the month prior to Robbins' aneurysm in which her father tells Robbins to "get your life together," get out of that "drug den," that Robbins "doesn't have to do drugs to be accepted," and does not "need this scumbag for drugs." Dr. Perazzo also offered post-surgery hospital forms noting Robbins' cocaine and alcohol abuse history and one record stating that Robbins

only quit using marijuana and cocaine on September 27, 2010, the day of her first surgery.

Alternatively, Dr. Perazzo produced no physical evidence that Robbins was under the influence of drugs or alcohol at the time of, or anytime near, her initial trip to the ER on September 15, 2010. It is also undisputed that twelve days later, on September 27, 2010, when Robbins was re-admitted for surgery, a toxicology screen confirmed that she did not have drugs or metabolites in her system.

The trial court entered a series of orders that excluded all evidence regarding Robbins' drug or alcohol abuse. The trial court stated the following:

> The court does not find any evidence suggesting profound, chronic, prolonged use of illegal substances by plaintiff in or near September 2010. Nor does the court see any expert testimony supporting any relevance of the use of unspecified substances to plaintiff's damages; Dr. Janiak's statement that the use of cocaine and methamphetamine is a risk factor for subarachnoid hemorrhage, even if it could be supported by evidence of plaintiff using such substances, only goes to the cause of plaintiff's condition and not the treatment thereof which is the issue before the court. Dr. Perazzo's own testimony that knowing the patient had risk factors, or even a known aneurysm, would not have changed her diagnosis given the clinical presentation, seems to limit the relevance of evidence of drug use.
>
> If there is expert testimony that would change the protocol or the standard of care for a patient with either remote or recent drug use, or that is relevant to the theory that such would have made treatment on September 15

riskier or affected plaintiff's ultimate recovery, please point that out to me as soon as possible so that the court can review that in considering the motions.

The trial court ultimately prohibited Dr. Perazzo or Dr. Doerger from introducing at trial "any comment, mention, suggestion, argument or statement regarding Melanie Robbins' past use of any form of drug or consumption of alcohol."

We do not believe the trial court abused its discretion in excluding evidence of Robbins' alleged drug and alcohol use. When looking at the standard of care, Dr. Perazzo stated that knowledge of Robbins' prior alcohol or drug abuse would not have changed how she diagnosed or treated Robbins:

> The Court: To the extent that you're able to say that [Robbins'] behavior would have caused this, which is the question to you.
>
> Dr. Perazzo: Okay, yes.
>
> The Court: Would that have made you react any differently?
>
> Dr. Perazzo: Not to this headache.

Further, a panel of this Court has stated that "[p]ersons providing medical treatment . . . should expect to treat not only patients who fall ill or are injured through no fault of their own, but also those whose own neglect or intentional conduct has placed them in the precarious position of requiring medical treatment." *Pauly v. Chang*, 498 S.W.3d 394, 418 (Ky. App. 2015) (internal quotation marks omitted).

-15-

As to whether the alleged drug and alcohol use provided a cause for the ultimate injury, the trial court noted the experts produced by the defendants were basing opinions on "ifs," and that the only other evidence primarily consisted of hearsay statements from Facebook messages, a dismissed criminal charge, and a positive cocaine test three years prior. Moreover, all of Dr. Perazzo's experts concerning Robbins' alleged drug and alcohol use qualified their opinions with the following factual requirements in order for the standard of care to change, for the evidence to be relevant as to causation, or for Robbins to have contributed to her injuries: (1) that Robbins used cocaine within 48-72 hours before the onset of her headache; (2) that after she suffered the headache she continued to use cocaine and it worsened her headache; or (3) that she used cocaine weekly for six months or more. The trial court determined that there was no relevant evidence of the foregoing, and we find no abuse of its discretion.

### d. Cumulative Error

Finally, Dr. Perazzo argues that the cumulative error doctrine warrants a new trial based on four alleged trial errors. The doctrine protects a criminal defendant's right to a fair trial, and has been described by the Kentucky Supreme Court as "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky.

2010). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id*. (citation omitted).

Dr. Perazzo provides a short recitation of four claimed errors at the end of her brief, which does not provide us with enough substance to analyze such alleged errors under the cumulative error doctrine. Further, as none of the individual issues discussed above resulted in a finding of error by the trial court, we do not find reversible cumulative error in this case.

## CONCLUSION

For the foregoing reasons, we affirm the Kenton Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANTS:

Virginia Hamilton Snell
Deborah H. Patterson
Sean G. Williamson
Louisville, Kentucky

David C. Calderhead
Joshua F. DeBra
Loveland, Ohio

BRIEF FOR APPELLEE:

Jim Leventhal
Benjamin Sachs
Denver, Colorado

Robert E. Sanders
Covington, Kentucky

Delana S. Sanders
Crescent Springs, Kentucky

Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky